UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.                                                              CRIMINAL NO. 3:13-CR-0011(AVC)

KEVIN WALLIN                                            August 29, 2018

## MEMORANDUM RE:  REVOCATION HEARING

  Kevin Wallin respectfully submits this memorandum regarding the revocation hearing scheduled for August 30, 2018 at 3:00 p.m.  Mr. Wallin will ask the Court at the hearing to continue his supervision and to modify the conditions of his supervised release to permit him to obtain treatment at the Salvation Army Adult Rehabilitation Center, a long-term (7-12 month) residential, in-patient substance abuse treatment program to which Mr. Wallin has already been accepted and is scheduled to commence on Thursday, August 30, 2018.  This outcome will best address the only basis for the violation, which is the disease that is his drug addiction.

**Procedural Posture**

  On October 27, 2014, The Honorable Alfred V. Covello sentenced Kevin Wallin to 65 months' imprisonment, followed by five years of supervised release, in connection with his guilty plea to one count of conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846.

  Mr. Wallin commenced his term of supervised release on November 9, 2016.  On August 24, 2018, the Probation Office filed a Petition for Warrant or Summons for Offender Under Supervision ("Petition").  Doc. No. 320.  The Report alleges that Mr. Wallin, an undisputed methamphetamine

addict, violated the terms of his supervised release by using methamphetamine. A hearing has been set on this matter for August 30, 2018 at 3:00 p.m.

Mr. Wallin is an active participant in the Bridgeport Support Court program, a program designed for people struggling with drug addiction. Support Court continues to work with Mr. Wallin and has not terminated him from the program. Importantly, although Mr. Wallin's drug screen on August 10, 2018 was positive for methamphetamine, all other drug screens in the last four months, including two screens after August 10 (on August 15 and 20) have been negative.

**Factual Background**

Kevin Wallin is 66 years old. Until age 57, Mr. Wallin had no struggles with addiction of any kind and no intersection with the criminal justice system whatsoever. A monsignor in the Catholic Diocese of Bridgeport, he was hard-working, accomplished, and beloved by his congregations, as well as by his superiors. In 1981, Mr. Wallin enrolled in the Catholic University of America in Washington, D.C. and earned his pontifical degree, Bachelor of Sacred Theology, in May 1985. He was ordained a Roman Catholic minister on December 22, 1984. From that moment on, Kevin Wallin was a priest. It was not something that he did; it was who he was. He has been hailed a gifted homilist, fund-raiser, educator, and has been said to have a gift for making theology accessible to common folk. He is a theological scholar and has written extensively. He has completed uncountable numbers of charitable works.

Some of the highlights of Mr. Wallin's career include:

- Mr. Wallin became personal secretary to Bishop Walter Curtis, after having served as a priest for only 2 ½ years. He performed his duties so well that he was asked

  to remain as personal secretary to Bishop Curtis' successor, Bishop Edward Egan, who later became Cardinal Egan.

- Mr. Wallin was given the title "Monsignor" by Pope John Paul II after having served as a priest for only six years – an honor that is extremely unusual and particularly unusual at such a young age.

- Mr. Wallin served as a pastor of two parishes – St. Peter's Parish in Danbury and the Cathedral Parish in Bridgeport – for which he was responsible for all aspects of the spiritual and logistical functions of the church.

- As pastor of the St. Peter's Cathedral in Danbury, Mr. Wallin was personally responsible for raising $2 million dollars for use in renovating the Cathedral. He was responsible for supervising and orchestrating the $4.2 million renovation project.

- Monsignor Wallin served on the Pastoral Advisory Council of Saint Vincent's Medical Center in Bridgeport and was a founding member of the Board of Directors of AIDS Ministries Program of Connecticut.

- Mr. Wallin served as Chaplain to the Order of Malta for the Connecticut area and as Spiritual Advisor to the Board of Counselors of the American Association of the Order of Malta for 17 years. The Order of Malta is a worldwide order that seeks to promote work for the poor, sick, and disabled, as well as the defense of the Catholic faith. Mr. Wallin served as the principal Chaplain for the Lourdes pilgrimage and organized countless pilgrimages for Malta members to the Holy lands, Rome, and elsewhere.

- Monsignor Wallin served on the Board of Directors for Sacred Heart University, the second largest Catholic University in America, for 20 years.

- He earned the Curtis Medal, the highest award given by Sacred Heart University, as well as the Discovery Award.

- He served as the Executive Director for the Inner City Foundation for Charity and Education for 21 years.

He was also badly stressed by his work, as he had totally and completely given his life to others, struggling to perform his duties with insufficient support yet constantly in demand for more

3

tasks. When he was introduced to methamphetamine for the first time in his 57 years, he rapidly became deeply addicted. That addiction led to dealing meth to support his habit, withdrawal from his priestly duties, and eventually his arrest and conviction. In essence, his addiction ate up everything he had accomplished to that point in his life. And it eats at him still.

During his incarceration and after his release, Mr. Wallin has dedicated himself to addressing his addiction. While in prison, he completed the BOP 500-hour substance abuse program. After his release he was evaluated by Connecticut Renaissance, Inc., in Bridgeport, as a result of which it was recommended he attend their Relapse Prevention Program. On the day that he was released from BOP custody, November 9, 2016, he began observing Bridgeport Support Court, and he continued observing every week until he was formally admitted on January 4, 2017.

When he relapsed in April 2017, he was referred to an Intensive Outpatient Program (IOP) at Renaissance. After another positive drug test, it was recommended that he engage in individualized counseling, which he did. He underwent two more periods of inpatient treatment, from July 20, 2017 to August 19, 2017 at St. Vincent's Hospital of Westchester Inpatient Rehabilitation Program in Harrison, New York, and September 5, 2017 to December 1, 2017 at the APT Foundation. He successfully completed both programs. After successful completion of the latter program, Mr. Wallin restarted his participation in Support Court. He also engaged in IOP at Connecticut Renaissance and further individual counseling. Mr. Wallin has volunteered regularly at Connecticut Community for Addiction Recovery (CCAR), the Dorothy Day Hospitality House and Shelter, and the Malta Justice Initiative.

4

On March 28, 2018, the Probation Office received notification from Connecticut Renaissance, which indicated that Mr. Wallin had submitted a urine screen on March 19, 2018, which tested positive for methamphetamine. The Support Court team addressed Mr. Wallin's drug use by moving him back to the start of Phase 2 in the program. In addition, Judge Underhill sanctioned him by ordering him to complete 100 hours of telephone calls to individuals struggling with addiction. Mr. Wallin continued to participate in Support Court.

On April 19, 2018, Mr. Wallin appeared before this Court in response to his relapse on methamphetamine. During the Court proceeding, undersigned counsel proposed that the Court permit Mr. Wallin to remain on his current term of supervised release and to modify his conditions of release to implement the following plan:

- Participation in Support Court
- Completion of Support Court sanction (100 phone calls to struggling addicts)
- Participation in outpatient treatment (two or three times per week)
- Random urinalyses (at least weekly if not more)
- Participation in weekly psychotherapy one-on-one counseling
- Participation in 12-step meetings (30 meetings in 30 days)
- Work with a sponsor in the 12-step context
- Home incarceration for four months with electronic monitoring
- Daily contact with USPO until further direction by USPO

Following the April 19, 2018 court hearing, Mr. Wallin maintained daily contact with his Probation Officer until April 27, 2018 when he began home confinement, on which he has remained

5

until August 27, 2018. Mr. Wallin was compliant with all terms of his home confinement. He completed attendance at 30 meetings in 30 days. Thereafter, he continued attending between four and seven 12-step meetings every week. He completed his Support Court sanction of calling struggling addicts. He completed outpatient treatment and relapse prevention treatment. He provided verification of his 12-step work through a third-party approved by the United States Probation Office. He attended Support Court on a weekly basis. At Support Court, Mr. Wallin volunteered to coach other participants on journaling and assisted several participants to improve their daily journaling assigned. Mr. Wallin continued attending individual therapy. He continued working with a sponsor.

In the last four months, Mr. Wallin has made more positive progress addressing his addiction than he has ever made previously. He completed the treatment plan set forth for him at the last hearing and he complied perfectly with an extremely rigorous set of conditions. He had one positive drug test in a four month period and his positive drug test was limited to one test only. The two tests that have followed on August 15, 2018 and August 20, 2018 have both been negative. The fact that Mr. Wallin has relapsed again speaks to the severe nature of his addiction and how much he needs treatment.

**Discussion**

The purpose of this memorandum is to ask the Court to permit Mr. Wallin to remain on his current term of supervised release and to modify his conditions of release to order him to participate in long-term, residential, in-patient treatment at the Salvation Army.

1. <u>The purpose of supervised release is to help a person transition to society, not to punish them, and that should remain the court's focus in this proceeding.</u>

Whether the Court is considering modification of conditions, termination of supervised release, or revocation with a new sentence, the considerations are the same: The Court may only act "after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)." 18 U.S.C. § 3583(e).  What is missing from that list is § 3553(a)(2)(A): the Court is not required to consider the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  The Supreme Court made clear the importance of that omission:

> The SRA then provides additional guidance about how the considerations listed in § 3553(a)(2) pertain to each of the Act's main sentencing options— imprisonment, supervised release, probation, and fines. <u>See</u> § 3582(a); § 3583; § 3562(a); § 3572(a).  These provisions make clear that a particular purpose may apply differently, or even not at all, depending on the kind of sentence under consideration.  For example, a court may *not* take account of retribution (the first purpose listed in § 3553(a)(2)) when imposing a term of supervised release.

<u>Tapia v. United States</u>, 564 U.S. 319 (2011) (emphasis in original).  This has been recognized by the Second Circuit:

> Supervised release was established by the Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551 et seq., and was designed "to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release." S.Rep. No. 98–225, at 124 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3307; <u>see also</u> <u>United States v. Johnson</u>, 529 U.S. 53, 59, 120 S. Ct. 1114, 146 L.Ed.2d 39 (2000) ("Congress intended supervised release to assist individuals in their transition to community life.  Supervised release fulfills rehabilitative ends, distinct from those served by incarceration.").  Supervised

7

> release is not, fundamentally, part of the punishment; rather, its focus is rehabilitation.

United States v. Aldeen, 792 F.3d 247, 252 (2d Cir. 2015), as amended (July 22, 2015).  As the Supreme Court said in Johnson, "supervised release, unlike incarceration, provides individuals with postconfinement *assistance*."  Johnson at 59 (emphasis added).

The Sentencing Commission specifically explained the reason for the omission of § 3553(a)(2)(A) from the sentencing factors for supervised release:  "The legislative history indicates that section 3553(a)(2)(A) was not included for consideration under 18 U.S.C. § 3583(c) because the primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than to punish them."  "Federal offenders Sentenced to Supervised Release," ("2010 Report") July 2010, p.9.[1]  See also United States v. Hanrahan, 508 F.3d 962, 971 (10th Cir. 2007) (The purpose of a supervised release sentence is to provide enough supervision to prevent recidivism, citing U.S.S.G. Ch.7 Pt. A(4) ("the purpose of . . . supervised release should focus on the integration of the violator into the community, while providing the supervision designed to limit further criminal conduct").

---

[1] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2010/20100722_Supervised_Release.pdf (last visited March 26, 2018).

2. <u>The court should exercise its discretion to impose the proposed treatment plan on Mr. Wallin rather than incarceration.</u>

Under certain circumstances, a defendant who has used or possessed illegal drugs three or more times in a single calendar year is subject to mandatory revocation of supervised release:

> If the defendant—
>
> (1) possesses a controlled substance in violation of the condition set forth in subsection (d);
>
> \* \* \* \* \*
>
> (4) as a part of drug testing, tests positive for illegal controlled substances more than 3 times over the course of 1 year; the court shall revoke the term of supervised release and require the defendant to serve a term of imprisonment not to exceed the maximum term of imprisonment authorized under subsection (e)(3).

18 U.S.C. § 3583(g). However, the court has the discretion to decline to implement that requirement:

> The court shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception in accordance with United States Sentencing Commission guidelines from the rule of section 3583(g) when considering any action against a defendant who fails a drug test.

18 U.S.C. § 3583(d). <u>See also</u> <u>United States v. Wirth</u>, 250 F.3d 165, 170 (2d Cir. 2001) (per curiam) ("We recognize that § 3583 was amended in 1994 to allow district courts to carve out an exception to § 3583(g) in cases where a substance abuse treatment program is available and appropriate."). The decision of whether to apply the exception is at the discretion of the district court. <u>See</u>, e.g., <u>United States v. Lewis</u>, 424 F.3d 239, 242 (2d Cir. 2005) (exception denied because of defendant's

9

"consistently poor adjustment history"). The Court should exercise that discretion here, because Mr. Wallin has a serious addiction and needs inpatient treatment, which is currently available at no cost to the Court and is the best way to address his addiction which is the only basis for the violation.

       3. <u>The Second Circuit has acknowledged that recovery from addiction is an uneven process.</u>

In <u>United States v. Maier</u>, 975 F.2d 944, 945 (2d Cir. 1992), Judge Newman, writing for the Second Circuit, observed that recovery from addiction is an uneven process. In <u>Maier</u>, the seminal decision establishing that extraordinary efforts at rehabilitation can merit a downward departure from the guidelines, the defendant repeatedly failed to maintain abstinence from drugs. As noted in the <u>Maier</u> decision:

> The evidence presented to Judge Sweet disclosed that [Maier's] efforts toward rehabilitation followed an uneven course, not a surprising result for someone with a fourteen-year history of addiction. . . . Such occurrences are the rule during recovery rather than the exception, and should not be cause for undue alarm. Narcotics addiction is a chronic form of pathology and recovery actually represents an attempt to militate against one's life history and psychological development. Recovery is experienced as an unending feeling of stress, an unnatural refusal to go along with the demands of body and mind. That the recovering addict might momentarily be unable to exert their nascent "good self" is not only easy to appreciate but equally witness to the initial fragility of the process.

<u>Id.</u>

Similarly, psychologists have concluded that the misuse of addictive substances can lead to the presence of lasting neuropsychological impairments that may produce alterations at behavioral, cognitive, emotional, and personality levels in the abuser subjects. In one study of persistent opioid users, psychologists concluded that users demonstrated signs of impairments in executive function, including with respect to impulse control, mental flexibility, and other executive functions. Antonio

Verdejo-Garcia, et al., <u>Clinical Implications and Methodological Challenges in the Study of Neuropsychological Correlates of Cannabis, Stimulant, and Opioid Abuse</u>, 14 Neuropsychology Review at 8-10 (March 2004).  Like so many addicts who have struggled with addiction for a lifetime, Mr. Wallin suffers from more than drug cravings.

Mr. Wallin has attempted to rehabilitate himself in several significant ways, including the BOP's RDAP program, two significant in-patient treatment programs, and participation in Support Court, which is an intensive form of supervision to which Mr. Wallin voluntarily subjected himself. Like the defendant in <u>Maier</u>, however, his recovery has not been free from failure.  Failures are, as Judge Newman observed, often part of the process of recovery.  Mr. Wallin, however, has not given up hope for recovery.  He does not want the Court to interpret his actions as a lack of desire to change. He is motivated to make a change and to receive treatment.  Undersigned counsel has spent many hours with Mr. Wallin discussing his addiction and believes that Mr. Wallin genuinely wants to make a change, and needs help to do so.  This can be seen in Mr. Wallin's decision to attend Support Court on November 9, 2016, the very day he was released from BOP custody, long before any possible violation status.  It also can be seen in his completion of Support Court sanctions, and his willingness to continue engaging in treatment.

Since the April 2018 court date, Mr. Wallin made several significant changes.  He obtained his longest period of sobriety while in the community.  He became committed to attending 12-step meetings and working with a sponsor.  He became committed to individual therapy.  He completed a term of home confinement.

11

Mr. Wallin has not committed any new crimes. He is a struggling drug addict, which is a medical disease, not a crime. He should not be punished for suffering from a disease, particularly when an alternative exists to help him continue to treat his disease. The literature suggests that when confronting addiction, it often takes several courses of treatment in order to see positive results, and that individuals who repeat courses of treatment at different times in their lives often achieve different results.

4. <u>A sentence of incarceration would be a waste of money.</u>

Given the severity of Mr. Wallin's addiction, a prison term will not help him recover and will make his addiction worse. Such a sentence would be purely punitive, which is not consistent with the purpose of supervised release. Mr. Wallin's original sentence did not rid him of his drug addiction, and there is no reason to believe that warehousing him for another period will do so. The monthly cost of prison is $2,989.00. In contrast, the monthly cost of supervision by a Probation Officer is $366.00. To spend that kind of money would be a waste, particularly where a community treatment plan exists as it does here, and particularly where the community treatment plan (the Salvation Army) costs no money whatsoever.

Research suggests that the central factors that buffer a person from crime, include full-time employment in a satisfactory job, a high-quality marriage bond, pro-social peers, a sense of control over one's future, a purpose in life, an ability to contemplate change, and community connections. On the other hand, factors that tend to support crime include substance abuse, lack of stable employment or housing, financial problems, family/marital relationship problems, and poor use of

12

leisure time and recreation. D.A. Andrews & James Bonta, The Psychology of Criminal Conduct 58-60 (5th ed. 2010).

Virtually all of those factors support continuing Mr. Wallin's supervision rather than incarcerating him. Continuing his supervision in a free, long-term, in-patient program, to which he has already been accepted, will maximize his chances of success. The Salvation Army will provide substance abuse and mental health treatment, housing, on-site employment, and the prospect of continued employment moving forward.

For all of these reasons, Mr. Wallin respectfully requests that the Court modify the terms of his supervised release so that he may attend long-term residential treatment at the Salvation Army. He is scheduled to begin the program on Thursday, August 30, 2018 and can begin immediately following court.

Respectfully Submitted,

THE DEFENDANT,
Kevin Wallin

FEDERAL DEFENDER OFFICE

Date: August 29, 2018          /s/ Kelly Barrett
                                First Assistant Federal Defender
                                265 Church Street, 7th FL
                                New Haven, CT 06510
                                Phone: (203) 498-4200
                                Bar No.: ct27410
                                Email: kelly_barrett@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 29, 2018, a copy of the foregoing Memorandum re: Revocation Hearing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                            /s/ Kelly Barrett
                                            Kelly Barrett